927 F.2d 1345
 FIRST FEDERAL SAVINGS BANK AND TRUST, a federal savings
bank; First Federal BanCorp, Inc., a Delaware corporation;
Lakeland Service Corporation, a Michigan corporation; and
Citizens Federal Savings Bank, a federal savings bank,
Plaintiffs-Appellants,
v.
T. Timothy RYAN, Director, Office of Thrift Supervision, in
his own official capacity and as successor in interest to
the Federal Home Loan Bank Board; Federal Home Loan Bank of
Indianapolis; Federal Deposit Insurance Corporation, in its
own capacity and as successor in interest to the Federal
Savings and Loan Insurance Corporation, Defendants-Appellees.
 No. 90-1785.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 16, 1990.
Decided March 12, 1991.
 
 Ernest R. Bazzana, Deanna E. Hazen, Maura D. Corrigan (argued), Dennis M. Day, Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, Detroit, Mich., for plaintiffs-appellants.
 Aaron B. Kahn (argued), James A. Hendriksen, Charlotte Caplow, Office of the Dept. of Treasury, Thrift Supervision, Washington, D.C., for defendant-appellee T. Timothy Ryan.
 Richard C. Sanders, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., Jonathan West, Federal Home Loan Bank of Indianapolis, Indianapolis, Ind., for defendant-appellee Federal Home Loan Bank of Indianapolis.
 Michael Sitcov, Dept. of Justice, Civ. Div., Washington, D.C., Scott R. McIntosh, U.S. Dept. of Justice, Appellate Div., Jacob M. Lewis, U.S. Dept. of Justice, Douglas Letter, Dept. of Justice, Appellate Staff, Civ. Div., Washington, D.C., for defendant-appellant FDIC.
 Before KEITH and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judge.
 BOGGS, Circuit Judge.
 
 
 1
 First Federal Savings bank[1] feels that it responded to its country's call (albeit also with the hope of making a profit) by purchasing and merging with an insolvent Florida savings and loan. It did so with, at least in its own mind, certain understandings about the rules regarding the regulations governing the accounting treatment of the new entity. Since no good deed goes unpunished, the Office of Thrift Supervision ("OTS") (successor to the Federal Home Loan Bank Board ("FHLBB")) contends that recent statutory changes affect institutions such as First Federal that made deals with the Federal Savings and Loan Insurance Corporation ("FSLIC") and the FHLBB to take over failing institutions with understandings about the accounting treatment. The position of the OTS causes First Federal to believe that there is an immediate threat of adverse action--such as the appointment of a conservator or receiver. It has sought temporary relief barring regulators from exercising, at any time in the future, their general statutory powers to appoint a conservator or receiver for a financial institution when that institution's financial condition warrants it. The district court denied the requested relief and First Federal now appeals.[2] This case was briefed on an expedited basis so that it could be decided together with a companion case involving similar issues, Franklin Federal Savings Bank v. Director, Office of Thrift Supervision, 927 F.2d 1332.
 
 
 2
 We hold that the controversy is currently so amorphous and subject to so many contingencies that it is not now ripe for review. We also hold that First Federal has an adequate statutory remedy should such a conservator be appointed and that no other means of challenging a potential appointment is provided. Though we differ, in part, with the reasoning of the district court's opinion, we affirm the judgment of the court below.
 
 
 3
 * In 1989, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA). FIRREA changed, in some quite important ways, the accounting conventions to be applied by thrifts in meeting various regulations involving capital structure. The requirements for capital structure themselves were changed as well. Additionally, FIRREA eliminated both the FSLIC and the FHLBB. The Act assigned their regulatory functions to the newly-created Office of Thrift Supervision (OTS) and their insurance functions to the Federal Deposit Insurance Corporation (FDIC), though now, as before, there is a degree of functional overlap.
 
 
 4
 First Federal claims that it relied to its detriment on the old regulatory policy by entering into a so-called "assisted transaction"--the acquisition of a financially troubled or insolvent thrift by a healthy thrift consummated with the approval and encouragement of the FSLIC and the FHLBB. These transactions were a part of the early regulatory response to the travails of the savings and loan industry. In our case, as in many of these situations, the idea was to merge a healthy thrift and an ailing thrift and create a single healthy institution. Unfortunately, the new rules for measuring whether an institution is healthy make First Federal seem sick. The crux of First Federal's complaint is that the OTS shouldn't be allowed to change the rules in the middle of the game.
 
 
 5
 This case (and the companion case, Franklin Federal ) requires us to determine what effect the course change should have on adversely affected institutions and what, at this point, a federal district court can do appropriately about the bank's situation.
 
 
 6
 First Federal is federally chartered, and is located in Oakland County, Michigan, one of the wealthiest communities in the Midwest. First Federal began in business in 1934 as a federally-chartered mutual savings and loan association. Then, in September 1987, First Federal began operating as a federal stock savings bank. The parent corporation, First Federal Bancorp, which is chartered in Delaware, owns all outstanding First Federal Savings and Trust stock. First Federal Bancorp is now publicly held and traded on the American Stock Exchange.
 
 
 7
 Citizens Federal, a savings and loan located in Florida, became insolvent and was placed in receivership by the FHLBB. Instead of liquidating Citizens, the FSLIC, as receiver, decided to find a purchaser who might be able to save Citizens. In a transaction that it almost certainly now regrets, First Federal paid the FSLIC $500,000 to acquire Citizens. Like most business deals, it was supposed to help both parties. The FSLIC was spared the trouble and considerable expense of liquidating the assets and paying off the insured depositors. First Federal hoped to turn Citizens into a profitable enterprise. Neither party wanted the transaction to fail and both believed that First Federal could succeed with Citizens.
 
 
 8
 The takeover of Citizens generated a number of documents. We use the general and neutral term "documents" advisedly, since the parties differ as to which of the documents constitute binding terms of whatever contract existed between First Federal on the one hand and the FSLIC and FHLBB on the other hand. At this point, we do not make any judgment regarding the legal effect, if any, of some of these documents. Instead, we simply list the important documents and briefly summarize their contents. We will divide these documents into two categories: documents communicated to First Federal by the FSLIC or entered into between First Federal and the FSLIC (whatever the case may be) and those communicated to First Federal by the FHLBB or entered into between First Federal and the FHLBB (again, whatever the case may be).
 
 FSLIC Documents:
 
 9
 Assistance Agreement. This agreement, dated September 1, 1988, completed the transaction to acquire Citizens. This agreement contained the terms of the sale itself--how much First Federal would pay, details of allocating tax benefits, indemnification agreements, etc. The only term of this agreement that might be relevant provides for the use of accounting principles "in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or the Financial Accounting Standards Board ('FASB') or any successor organization of the American Institute of Certified Public Accountants, respectively." The agreement also stated that "[t]he rights, powers, and remedies given to the parties by this agreement shall be in addition to all rights, powers, and remedies given by any applicable statute or rule of law. Any forbearance, failure, or delay by any party in exercising or partially exercising such right, power, or remedy shall not preclude its further exercise." Otherwise, the details of this agreement are not important or relevant to this litigation.
 
 
 10
 Merger Agreement and Plan of Merger. This agreement facilitated that actual takeover of Citizens itself. It created a new corporate entity--"New Citizens"--that then agreed to merge into "Old Citizens." The terms of this agreement are not relevant to this litigation.
 
 
 11
 Regulatory Capital Maintenance Dividend Agreement. This agreement governed First Federal's obligations to meet regulatory capital requirements and was dated September 1, 1988. First Federal agreed to "maintain the Institution's [Citizens'] Regulatory Capital in compliance with the Regulatory Capital Requirement and the limitations imposed by Section IV of this Agreement...." Further, First Federal promised to maintain the regulatory capital of Citizens at or above the regulatory capital requirement and to infuse its own capital as necessary in order to meet the regulatory capital requirements within one quarter after discovery of the deficit.[3] The agreement defined Regulatory Capital as "the institution's regulatory capital requirement at a given time computed in accordance with 12 C.F.R. Sec. 563.13(b), or any successor regulation thereto, except to the extent that the Board [FHLBB] has agreed to forbear." However, the agreement also provided that "[a]ll references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirer's obligation under this agreement."
 
 
 12
 The OTS contends that the provisions of these three agreements between the FSLIC and First Federal are the only documents creating binding obligations between it, as successor to the FSLIC and the FHLBB, and First Federal. Moreover, the OTS also maintains that the disclaimers in the "Assistance Agreement" and the "Regulatory Capital Maintenance Dividend Agreement" constitute express reservations by the FSLIC of the general regulatory power of the FHLBB to make any regulatory changes of general applicability regardless of any effect that such changes might have on First Federal's profitability under the agreement. First Federal claims that it would never have entered into the deal had it then understood the government's position to be as it is now stated. The OTS's response is basically caveat emptor: if you do business in a highly regulated industry, you must assume the risk of having regulations changed.
 
 FHLBB Documents:
 
 13
 Federal Home Loan Bank Board Approval of the Supervisory Conversion and Merger. In this document, the FHLBB approved the merger of Old Citizens and New Citizens, thereby allowing the takeover by First Federal. In order to facilitate this takeover, the FHLBB allowed Citizens to convert from the mutual form of ownership to the stock form. This document specified that "in accounting for the acquisition and Merger, the Holding Company and New Citizens shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the bank board and the FSLIC."
 
 
 14
 Implementing Resolution. This resolution of the FHLBB, dated September 2, 1988, gave the final go-ahead to execute the transaction to the FSLIC and to subordinate FHLBB officials.
 
 
 15
 Forbearance Letter. This letter, from the Federal Home Loan Bank, dated September 1, 1988, stated that, because First Federal's takeover of Citizens was "instituted for supervisory reasons" the FHLBB would forbear from enforcing various regulatory capital requirements for periods ranging from one to five years.
 
 
 16
 First Federal contends in its brief that all of these documents constituted agreements now binding on the OTS and that the agreements, taken together, allow it to recognize so-called "supervisory goodwill" acquired in the transaction as an intangible asset in measuring its compliance with capital requirements.[4] The OTS argues that the statements from the FHLBB constituted nonbinding statements of regulatory intent rather than agreements from the FHLBB. In order for First Federal to prevail, we would have to be convinced, at the very least, that communications from the FHLBB constituted parts of a binding agreement.
 
 
 17
 Even so, the terms of that agreement would not be totally unambiguous. It is true that First Federal's proposal to the FSLIC and FHLBB contains a provision that addresses the amortization of supervisory goodwill. However, this provision was not incorporated into any of the agreements between First Federal and the FSLIC. Neither the Assistance Agreement, the Merger Agreement nor the Regulatory Capital Maintenance/Dividend agreement refers explicitly to the amortization of supervisory goodwill. The FHLBB was similarly silent on this important issue. The FHLBB gave its approval of the supervisory conversion and merger and passed an implementing resolution. The FHLBB also provided a forbearance letter, but that letter has no provisions that refer explicitly to the issue of supervisory goodwill.
 
 
 18
 There is, nonetheless, some evidence from which one might infer that the agreement contemplated a particular accounting treatment of supervisory goodwill. The FHLBB Approval of the conversion does provide for the use of Generally Accepted Accounting Principles (GAAP). Though no evidence regarding the requirements of GAAP is in the record before us on appeal, we conclude, based solely on the statements of the parties, that GAAP would generally allow the use of supervisory goodwill.[5] And it is not disputed that, at the time of the transaction, applicable statutes and FHLBB regulations would have allowed much greater use of supervisory goodwill to meet regulatory capital requirements. Thus, we would have a difficult time in resolving the merits of this dispute based on the record at hand.
 
 II
 
 19
 In August 1989, not quite a year after the consummation of these agreements among First Federal, Citizens, the FSLIC, and the FHLBB, Congress passed FIRREA. FIRREA abolished the FSLIC and FHLBB and tightened up the capital requirements for savings and loans. FIRREA also required the Director of the OTS to prescribe new capital standards for savings and loans. 12 U.S.C. Sec. 1464(t)(1). Additionally, savings and loans must meet core capital requirements amounting to not less than three percent of the institution's total asset base. 12 U.S.C. Sec. 1464(t)(2)(A). Most importantly, the new scheme also phases out the use of supervisory goodwill in order to calculate core capital. By January 1, 1995, supervisory goodwill cannot be counted at all toward core capital. 12 U.S.C. Sec. 1464(t)(3)(A). In addition, the period over which supervisory goodwill can be amortized has been limited to twenty years. 12 U.S.C. Sec. 1464(t)(9)(B).[6] Following the congressional mandate, the OTS has issued regulations that further restructure the capital requirements for institutions that it regulates. The most important of the new regulations, for our purposes, requires consolidated reporting for parents and subsidiaries in meeting capital requirements. Accordingly, First Federal must treat itself and Citizens as one entity for accounting purposes. Moreover, the OTS has indicated, in Thrift Bulletin 38-2, that it is the position of the OTS that new capital standards affect all thrift institutions--including those institutions that previously asked for and received forbearances from the FHLBB. Thus, the position of the OTS is that FIRREA has rescinded all regulatory forbearances approved by the FHLBB.
 
 
 20
 In the wake of its acquisition of Citizens, First Federal has not been able to meet the new requirements. In November 1989, the OTS presented First Federal with a supervisory directive. This required First Federal to refrain from making or amending any commercial loans, from giving overdrafts on its commercial lending accounts, and required an audit of the commercial lending department. First Federal has followed this directive.
 
 
 21
 The OTS also required First Federal to present a new capital plan in January 1990. Under First Federal's suggested capital plan, it would have met the new standards within five years. In a letter to First Federal, the OTS rejected the plan, in what First Federal has characterized as "conclusory" language. First Federal believes that the position of the OTS is too intransigent and inflexible and it cites a number of slights to support this contention. For example, First Federal indicates that the representatives of the OTS with whom they have had contact have indicated they the OTS will, in the near future, seek to appoint a conservator or receiver for First Federal. According to First Federal, a representative of the OTS even went so far as to say something to the effect of "you're dead already, so why fight it" at a negotiating session.
 
 
 22
 But what bothers First Federal the most is the OTS position regarding loan loss reserves. It is here that First Federal believes that the OTS has been particularly heavy-handed. First Federal has not experienced high loan losses in the past. From fiscal 1985 to 1989, First Federal experienced less than $500,000 in total loan losses. In March 1990, the OTS requested that First Federal increase its loan loss reserves to $6.1 million. It did so. Then, on June 29, 1990, the OTS again requested increased loan loss reserves, this time to $16 million. A short time later, on July 3, the OTS again upped its recommended reserve amount, this time to $27.5 million. First Federal claims that $8 million would be an appropriate loan loss reserve. Although First Federal seems displeased about these requests, the proper amount of loan loss reserves are not before us in this appeal. Though the OTS has undoubtedly made these requests, it has done so informally. Consequently, there is no final agency action subject to appellate review. See generally Greater Cincinnati Chamber of Commerce v. United States Environmental Protection Agency, 879 F.2d 1379 (6th Cir.1989).
 
 
 23
 Unsurprisingly, the OTS has a different explanation for its vigor. The OTS contends that FIRREA constitutes a clear congressional mandate ordering the OTS to enforce capital requirements firmly. Moreover, the OTS indicates that no decision regarding First Federal has yet been reached.
 
 
 24
 This litany of contention between the OTS and First Federal is, for the most part, irrelevant to the outcome of this dispute. We discuss it, however, because it is relevant to threshold issues that we must address prior to reaching the merits. It is because of its ongoing difficulties with the OTS that First Federal believes that the OTS is on the brink of appointing a conservator or receiver. As a result of this fear, First Federal filed a five-count complaint against the OTS on July 3, 1990.
 
 
 25
 In count I, First Federal alleged that the OTS could not appoint a conservator or receiver because First Federal did not meet the criteria set out in 12 U.S.C. Sec. 1464(d)(2)(E), the statutory provision relating to the appointment of a conservator or receiver. In count II, First Federal alleged that the OTS's rejection of the capital plan filed pursuant to 12 C.F.R. Sec. 567.10 was arbitrary and capricious. In count III, First Federal claimed that it had a contract with the FHLBB and the FSLIC and that the changes instituted in FIRREA frustrate the purpose of the contract, thereby entitling First Federal to recission of its agreement with the FSLIC and FHLBB. Count IV of the complaint alleged that the provisions allowing the Director of the OTS to appoint a conservator or receiver without prior judicial review violate First Federal's due process rights. Count V alleged that the provisions allowing appointment of a conservator or receiver would constitute an unconstitutional taking of property (i.e. property rights under its contract with the government) without just compensation. In its prayer for relief, First Federal asked for, inter alia, an order restraining the OTS from appointing a conservator or receiver.
 
 
 26
 The district court, after an ex parte hearing, granted First Federal a temporary restraining order (TRO) prohibiting the OTS from appointing a conservator or receiver for First Federal. First Federal then moved for a preliminary injunction. The judge denied the preliminary injunction but did extend the TRO to give First Federal time to appeal. First Federal then filed an interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(a)(1). This court granted a stay pending appeal which had the effect of restraining the OTS from appointing a conservator or receiver.
 
 
 27
 The OTS argued below that 12 U.S.C. Sec. 1464(d)(2)(E) deprives any district court of jurisdiction to consider an injunction against the appointment of a receiver and that the dispute was not sufficiently ripe for review. First Federal argues, in response, that the provisions of 12 U.S.C. Sec. 1464 simply do not address the case at hand, and, moreover, that denying it the right to challenge the appointment of a conservator or receiver in advance constitutes a denial of property without due process.
 
 III
 
 28
 In order for a court to issue an injunction against a regulatory agency, the dispute must be "ripe" for review. The district court concluded that, because the OTS had denied a capital plan submitted by First Federal, the dispute was ripe for review but denied the injunction anyway because the court did not have jurisdiction.[7] This is an interlocutory appeal of the denial of a request for a preliminary injunction. No final judgment has been entered in this case and the district court took no action regarding the denied capital plan. Further, the only issues briefed for appeal have to do with the propriety of enjoining the appointment of a conservator or receiver. Thus, the dispute before us in this appeal concerns only the propriety of granting an injunction against the appointment of a conservator or receiver. We believe that the district court framed the issue before it with insufficient particularity. Because of the procedural posture of this case, (an interlocutory appeal of denial of a preliminary injunction) we consider only whether a pre-appointment challenge to the appointment of a conservator or receiver is ripe for review.
 
 
 29
 The Supreme Court outlined the ripeness doctrine in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and two companion cases, Toilet Goods Association, Inc. v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) and Gardner v. Toilet Goods Association, Inc., 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). The rationale of the ripeness doctrine is relatively straightforward:
 
 
 30
 The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy "ripe" for judicial resolution. Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.
 
 
 31
 Abbott Laboratories, 387 U.S. at 148-49, 87 S.Ct. at 1515-16. In applying this rationale, the Supreme Court explained that the ripeness requirement turns on two factors: "The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 148, 87 S.Ct. at 1515.
 
 
 32
 Thus, we begin our analysis of ripeness by determining whether the issue in this case is fit for judicial decision. In Abbott Laboratories, Congress had passed a law requiring manufacturers of prescription drugs to provide the generic name of a drug when the proprietary name was used. Id. at 137-38, 87 S.Ct. at 1509-10. The Commissioner of Food and Drugs promulgated regulations requiring the generic name to be printed alongside the proprietary name every time the proprietary name was used--in advertisements or other printed materials, as well as on the label. Id. at 138-39, 87 S.Ct. at 1509-10. Several manufacturers challenged the regulation, on the grounds that the Secretary had exceeded the scope of his authority. Id. at 139, 87 S.Ct. at 1510. In deciding that the regulations at issue in Abbott Laboratories were fit for judicial resolution, prior to actual enforcement, the Supreme Court began by noting that "all parties agree that the issue tendered is a purely legal one: whether the statute was properly construed by the Commissioner to require the established name of the drug to be used every time the proprietary name is employed." Id. at 149, 87 S.Ct. at 1515. In Abbott Laboratories, then, the plaintiffs could challenge the regulation because the challenge involved only the authority of a particular official to promulgate a particular regulation. Once the regulation was found to be either legal or illegal, there were no questions regarding its application to the particular plaintiff's products.
 
 
 33
 In Abbott Laboratories, the decision of the purely legal issues resolved the dispute. Here, by contrast, resolution of legal issues would barely begin to resolve the dispute. It is true that a few of the issues addressed by the court might be considered purely legal--for example, whether Congress intended FIRREA to require the abrogation of agreements involving assisted transactions and, if so, whether that would always constitute a taking. However, those issues would not be dispositive. Other intensely factual issues would remain before the court could decide the dispute. A savings and loan might be solvent under one set of possibly applicable accounting procedures or regulatory requirements but not another. Alternatively, a savings and loan might be solvent (or insolvent) under any possibly applicable accounting procedures or regulatory requirments. Whatever the case might be, the court must make a factual determination as to the financial status of the savings and loan. It is only at the time of an enforcement action that the relevant facts will be fully developed.
 
 
 34
 To be sure, First Federal may be one of those banks where decision of the legal issues would, for all practical purposes, be dispositive. There is every indication that appointment of a conservator or receiver would, at this time, be wrong under the old regulatory scheme and possibly acceptable under the new. The point is, though, that making this determination requires us to go beyond the legal issues and look to the facts of the particular case before us--exactly what the courts did not have to do in Abbott Laboratories.
 
 
 35
 Furthermore, we note that First Federal's purpose in seeking a preliminary injunction is the eventual establishment of a permanent injunction. While, at this time, it appears that First Federal would not be in financial difficulties absent the new regulations, we have no way of knowing what the future will bring. First Federal could, in the future, become either financially stronger or weaker, so that the appropriateness of appointing a conservator or receiver would not depend solely on the applicability of new FIRREA requirements. Thus, any factual determination that a court might make prior to the appointment of a conservator or receiver could become outdated.
 
 
 36
 In response to these arguments, First Federal relies almost entirely on a district court case from the District for the District of Columbia, Olympic Federal Savings and Loan Association v. Office of Thrift Supervision, 732 F.Supp. 1183 (D.D.C.1990), appeal dismissed as moot, 903 F.2d 837 (D.C.Cir.1990). In Olympic Federal, the court, in a very cursory opinion, concluded that the dispute between Olympic Federal and the OTS was ripe for review. However, based on the nature of the plaintiff's complaint, we do not believe that the Olympic Federal court's analysis on this particular point is inconsistent with our own. In that case, the plaintiffs sought to enjoin the Director of the OTS from appointing a conservator or receiver arguing that the Director himself had been appointed in violation of the Appointments Clause of the Constitution and that the regulations changing capital requirements were issued in violation of the requirements of the Administrative Procedure Act. Id. at 1184-85. We agree with the OTS that Olympic Federal is distinguishable on its facts. As the Olympic Federal court noted, the dispute in that case involved purely legal issues and events that had already transpired. Id. at 1187. If the Director's appointment had been illegal, he would have no power ever to appoint a conservator or receiver; if regulations were themselves invalid, they could never apply to the plaintiff. The claim launched by the plaintiffs in our case is quite different, as it requires the court to resolve both legal and factual issues. Moreover, while some events at issue in our case have already taken place, one critical fact--the financial status of First Federal--is subject to change, possibly quite unexpected or radical change.
 
 
 37
 The court in Abbott Laboratories also noted that the regulations at issue in that case constituted "final agency action." Abbott Laboratories, 387 U.S. at 149-50, 87 S.Ct. at 1515-16. The appointment of a conservator or receiver would constitute final agency action only once the appointment took place, not before. Mere contemplation of a course of action does not constitute a final agency action. However, it is undisputed that no conservator or receiver has yet been appointed. There is just no way that we can be sure, as of now, that the OTS will ever choose to appoint a conservator or receiver, or the circumstances under which it would do so.
 
 
 38
 Nor do we find that withholding judicial review would constitute an undue hardship upon the parties. First Federal believes that it would be better off if the OTS were enjoined from appointing a conservator or receiver. This is undoubtedly an accurate view. First Federal may indeed be in an uncomfortable position--akin, perhaps, to a prisoner positioned face down on the guillotine, waiting for the executioner to pull the handle and loose the blade at any moment. However, we believe that this does not constitute undue hardship as the Supreme Court has applied and defined the term. The Supreme Court found that the regulations at issue in Abbott Laboratories did create an undue hardship but only because the regulations had "a direct effect on the day-to-day business of all prescription drug companies...." Id. at 152, 87 S.Ct. at 1517.
 
 
 39
 We believe that this case is analogous to one of Abbott Laboratories' companion cases, Toilet Goods Association v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967). In Toilet Goods, the Supreme Court considered a regulation providing that the Commissioner of Food and Drugs could suspend certification of any manufacturer upon finding that the manufacturer had refused to permit inspectors adequate access to manufacturing facilities. Id. at 161, 87 S.Ct. at 1523. Finding that the regulation was not ripe for review, the Supreme Court observed that "[t]he regulation serves notice only the Commissioner may under certain circumstances order inspection of certain facilities and data, and that further certification of additives may be refused to those who decline to permit a duly authorized inspection until they have complied in that regard. At this juncture we have no idea whether or when such an inspection will be ordered and what reasons the Commissioner will give to justify his order." Id. at 163, 87 S.Ct. at 1524 (emphasis in original). In Abbott Laboratories, on the other hand, the company was faced with a choice of obeying the regulation--thereby expending a great deal of money--or disobeying the regulation in order to challenge it and facing the possibility of harsh civil or even criminal penalties. Abbott Laboratories, 387 U.S. at 152, 87 S.Ct. at 1517. That is, the regulation at issue in Abbott Laboratories affected the company's "primary conduct." Toilet Goods, 387 U.S. at 163, 87 S.Ct. at 1524.
 
 
 40
 As we have previously explained, a dispute is not ripe unless the agency action at issue imposes some type of affirmative duty or burden of compliance upon the party seeking to challenge the action. Production Credit Association v. Farm Credit Administration, 846 F.2d 373, 375 (6th Cir.1988). Here, First Federal (or its officers) may feel nervous about the possibility of the appointment of a conservator or receiver. This risk, though personally uncomfortable, does not affect its behavior in any legally cognizable sense. That is, the threat of taking over the bank would not place First Federal in the kind of dilemma faced by the company in Abbott Laboratories. It need not make any investments or take any actions to meet regulatory requirements.
 
 
 41
 On this issue, as on the first, First Federal relies on Olympic Federal. In that case, the district court concluded that the plaintiff would suffer a hardship without review because the OTS could appoint a conservator or receiver at any time and without notice, either to the plaintiff or to a court. Olympic Federal, 732 F.Supp. at 1187. Here, we differ from the D.C. District because we believe the court mischaracterized the Abbott Laboratories test. The whole point of Abbott Laboratories was that the regulations already affected the plaintiffs because the regulations were presumptively binding upon the plaintiffs once the regulations had become effective. The focus of that test is on the consequences of agency action even absent enforcement action, not on the deleterious effect of possible future enforcement action itself. Any other interpretation would render the ripeness requirement meaningless, since a party would, if it believes that its challenge will succeed, almost always prefer to have a judgment sooner rather than later. Further, as we discuss below, we believe that the statutory provisions for review of the appointment of a receiver meet the standards of due process and Article III of the Constitution.
 
 
 42
 Moreover, a dispute is not ripe for review unless it meets both prongs of the ripeness test. Production Credit, 846 F.2d at 374. Thus, a dispute must be fit for review and withholding review must impose hardship of a specific variety on the party seeking to challenge the agency action. Accordingly, as we believe that neither prong of the ripeness test has been satisfied, we conclude that the dispute between First Federal and the OTS is not ripe for review.
 
 IV
 
 43
 The OTS also argues that the provisions relating to challenging the actions of conservators or receivers appointed by the Director preclude review. The statute does not speak directly to the issue of whether the courts can enjoin the appointment of a conservator or receiver prior to the Director's action. Thus, we must analyze the structure of the statutory scheme and determine the result that is most consistent with it. There are two relevant provisions. 12 U.S.C. Sec. 1464(d)(2)(E) provides that "[t]he director shall have exclusive power and jurisdiction to appoint a conservator or receiver for a Federal savings association.... [T]he association may, within 30 days thereafter, bring an action in the United States district court ... for an order requiring the Director to remove such conservator or receiver, and the court shall upon the merits dismiss such action or direct the Director to remove such conservator or receiver." Subsection (G) is an anti-injunction provision, stating that "[e]xcept as otherwise provided in this subsection, no court may take any action for or toward the removal of any conservator or receiver or, except at the request of the Director, to restrain or affect the exercise of powers or functions of a conservator or receiver."
 
 
 44
 We must rule on the combined effect of these two provisions. The OTS contends that these provisions, taken together, deprive any court of jurisdiction to address the propriety of appointing of a conservator or receiver prior to the time that the Director chooses to appoint one. The language of 12 U.S.C. Sec. 1464(d)(2)(E) specifically gives the Director of the OTS "exclusive power and jurisdiction to appoint a conservator or receiver...." This Congressional granting of authority to the Director of the OTS would be essentially meaningless if any thrift could run to the nearest federal court and get an injunction upon the potential threat of having a conservator or receiver appointed. Once granted, an injunction would preclude the Director of the OTS from appointing an conservator or receiver without first getting permission from a federal court.[8] Congress chose to grant a particular power to an executive-branch official. Allowing this type of injunction would essentially repeal that decision, thereby totally undermining the statutory allocation of authority.
 
 
 45
 Obviously, Congress could have allowed the Director of the OTS to appoint a conservator or receiver only after petitioning a court to do so. However, Congress chose instead to limit judicial review to a specific period of time--thirty days after the appointment of a conservator or receiver. First Federal claims that this provision "is silent" regarding pre-appointment judicial review. However, the language of the statute provides for review "[i]n the event of such appointment" within a thirty-day period. 14 U.S.C. Sec. 1464(d)(2)(E). To us, that suggests that review is only available after a conservator or receiver has been appointed.
 
 
 46
 Subsection (G), the anti-injunction provision, lends further support to this conclusion. This section prevents the courts from interfering with the actions of a conservator or receiver, except if the court removes the conservator or receiver pursuant to subsection (E). We believe that the OTS is correct, and that interpreting these provisions to limit injunctions after the appointment of a receiver but to allow such injunctions prior to the appointment of the receiver would render the anti-injunction provision nugatory.
 
 
 47
 First Federal maintains that this interpretation of the statutory scheme is precluded by the Supreme Court's recent decision in Coit Independent Joint Venture v. Federal Savings & Loan, 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989). Actually, Coit has little to say about our case. And, to the extent that Coit does say something about our case, it supports the OTS.
 
 
 48
 In Coit, the plaintiff filed a state-law claim against a savings and loan. Id. at 566, 109 S.Ct. at 1365. Two months after the suit was filed, the FHLBB determined that the defendant savings and loan was insolvent and appointed the FSLIC as a receiver. Ibid. The FSLIC argued that statutory provisions in the Financial Institutions Supervisory Act of 1966 (FISA) virtually identical to those at issue in this case gave it exclusive jurisdiction to adjudicate state-law claims. Id. at 568, 109 S.Ct. at 1366. The Fifth Circuit had previously held that the statute did give the FSLIC exclusive jurisdiction to adjudicate state-law claims against banks in receivership. In particular, the Fifth Circuit relied on the anti-injunction provision of FISA. Id. at 570, 109 S.Ct. at 1367.
 
 
 49
 The Supreme Court ruled, in Coit, that the statute did not give the FSLIC any jurisdiction to adjudicate state-law claims. As the Supreme Court explained, "Congress granted FSLIC various powers in its capacity as receiver, but they do not include the power to adjudicate creditors' claims." Id. at 572, 109 S.Ct. at 1368. In so doing, the Supreme Court relied both on the nature of the "essential functions" of the receiver and upon the "plain language" of the statutory scheme. Ibid. The Court also noted that the anti-injunction language "does not add adjudication of creditor claims to FSLIC's receivership powers. It simply prohibits courts from restraining or affecting FSLIC's exercise of those receivership 'powers and functions' that have been granted by other statutory sources." Id. at 574, 109 S.Ct. at 1369.
 
 
 50
 We do not see how Coit supports First Federal's arguments. In Coit, the Fifth Circuit had ruled, based on its own precedent, that the federal courts lacked subject matter jurisdiction to rule on a claim brought by a third party against a bank in receivership. Here, by contrast, we decide an issue relating to the power of the OTS to initiate enforcement action against an entity clearly within its regulatory domain. Accordingly, we believe that the Supreme Court's analysis of the statutory scheme in Coit is consistent with our conclusion. As we have already noted, the statute does grant the OTS the power and function of deciding whether to appoint a conservator or receiver.
 
 
 51
 Further, the Supreme Court analyzed the "statutory context" of the provision in order to determine that the Fifth Circuit's interpretation was flawed. Ibid. In so doing, the Court explained that the anti-injunction provision was designed to "prohibit untimely challenges to the receiver's appointment or collateral attacks attempting to restrain the receiver from carrying out its basic functions." Ibid. We find this language significant. Though the Supreme Court did not explain exactly what would constitute an "untimely challenge," we believe that the Court would be best understood as referring to exactly the type of challenge launched by First Federal.
 
 
 52
 Moreover, the Supreme Court also relied on the "practical effects of court adjudication on the receivership process." Id. at 576, 109 S.Ct. at 1370. The Supreme Court found that the possible delays caused by the litigation there would not undermine the liquidation process. Again, our case is totally inapposite. By allowing any federal district court to entertain a motion for an injunction when the OTS is only contemplating the possibility of appointing a conservator or receiver, the OTS is prevented from even initiating the process. Its ability to preserve assets in the face of insolvency, whether caused by corruption, mismanagement, or just plain bad luck would be significantly undermined if courts could enter injunctions that would prevent the appointment of a conservator or receiver without prior permission of a court. The only purpose that we can see for giving the Director the power to appoint a conservator or receiver without prior permission in the first place is to free the OTS of having to get permission of a court before acting. First Federal's position would, in effect, allow an endangered thrift to launch a preemptive strike against the OTS after a mere hint that the OTS was contemplating the appointment of a receiver. This we decline to permit.
 
 V
 
 53
 We have concluded that First Federal's claim was not ripe for review and that the statutory scheme deprives the federal courts of jurisdiction to consider pre-appointment challenges to the appointment of a conservator or receiver. Normally, this would be the end of the opinion. However, First Federal also maintains that denial of pre-appointment review constitutes a denial of its due process rights and also violates Article III of the United States Constitution. Such arguments, if persuasive, might convince us to reexamine our conclusions on jurisdiction and ripeness. Accordingly, we now move to First Federal's constitutional arguments.
 
 
 54
 * First Federal argues that allowing the Director to appoint a conservator or receiver ex parte without any prior hearing either by a court or an administrative body violates its right to procedural due process. The Supreme Court affirmed the constitutionality of a provision substantially similar to the one at issue here over forty years ago, in 1947. See Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947). There, the Supreme Court held that a post-deprivation hearing was adequate, in that particular case, to meet due process requirements. Id. at 253, 67 S.Ct. at 1555.
 
 
 55
 While we agree with the OTS that the provisions at issue do not violate procedural due process, we do not rest our analysis solely on Fahey. We believe that due process doctrine has developed during the interval of over forty years from Fahey to today so that our task is not completed by cursory reference to Fahey. We consider here only the constitutional validity of denying a pre-appointment hearing, not of the anti-injunction provision as generally applied. At this point, we do not speak definitively to the meaning of the anti-injunction provision. It may be that the provision would still give a court some latitude to issue a stay merely in aid of its own jurisdiction prior to ruling on the merits. As we believe that the result is the same in any event, we will proceed on the assumption that First Federal's harsh interpretation of the anti-injunction clause is accurate.
 
 
 56
 First Federal maintains that the appointment of a conservator or receiver is equivalent to seizure of its property by the government without any hearing. We think that this is stretching a little, but we will, for now, assume arguendo the correctness of First Federal's position on this point. It is well established that the government can, under certain circumstances, seize property outright without a prior hearing. See Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 678, 94 S.Ct. 2080, 2089, 40 L.Ed.2d 452 (1974). Obviously, the conclusion that seizure of property is justified without a pre-deprivation hearing is not lightly reached. The government has been allowed to initiate the seizure of property without a prior hearing under certain very limited circumstances:
 
 
 57
 First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the States has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.
 
 
 58
 Fuentes v. Shevin, 407 U.S. 67, 91, 92 S.Ct. 1983, 2000, 32 L.Ed.2d 556 (1972). We believe that this situation meets this three-prong test. First, the safety of the banking system is generally considered to be an important governmental or public interest. In this country, it has long been established that the banking system is subject to government regulation and protection in the interest of economic stability. It is well established that banks or savings and loans can legitimately be placed under the control of a conservator or receiver without a hearing prior to the action. See Coffin Bros. & Co. v. Bennett, 277 U.S. 29, 48 S.Ct. 422, 72 L.Ed. 768 (1928). Second, the insolvent savings and loan is one of the classic situations in which prompt action is necessary. Third, the statute specifically limits the authority to determine whether to appoint a conservator or receiver to one official--the Director of the OTS.
 
 
 59
 Nonetheless, First Federal argues that it is entitled to a hearing because its post-deprivation remedy is not adequate. First Federal claims that the current practice of the OTS is to solicit secret bids, appoint the Resolution Trust Corporation (RTC) as a receiver on a Friday, balance the books over the weekend and execute the sale and open, under the aegis of a new institution, on Monday. Assuming that First Federal's account is accurate, we agree that this is a draconian measure. However, we believe that it is a constitutionally acceptable one. In the event of wrongful appointment of a receiver, First Federal could sue for all damages arising out of the wrongful appointment. See First English Evangelical Lutheran Church v. City of Los Angeles, 482 U.S. 304, 318, 107 S.Ct. 2378, 2387, 96 L.Ed.2d 250 (1987). The fifth amendment only requires that a party be compensated for a wrongful taking; it does not require federal courts to provide equitable relief preventing such takings. Anchor Pointe Boat-A-Minium Association, Inc. v. Meinke, 860 F.2d 215, 218 (6th Cir.1988). In addition, even given the anti-injunction provision, 12 U.S.C. Sec. 1464(d)(2)(G), a district court may, if the evidence is sufficiently strong and clear to convince the court on the merits, immediately remove a conservator or receiver under 12 U.S.C. Sec. 1464(d)(2)(E).
 
 B
 
 60
 First Federal also claims that allowing the Director of the OTS to appoint a conservator or receiver without a prior judicial hearing violates the provisions of Article III of the United States Constitution. First Federal relies on Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), for support. If we believed that FIRREA assigned adjudicative functions to administrative officials, we would have to explore one of the most complex and difficult areas of constitutional law. We would obviously have to consider Northern Pipeline, as well as the more recently decided Commodity Futures Trading Commission v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986).
 
 
 61
 We are spared the necessity of reaching these difficult issues, however, as we are convinced that the appointment of a conservator or receiver is not a "judicial power" subject to Article III of the United States Constitution. We believe that the power given to the Director to appoint a conservator or receiver is an executive power. Moreover, as with many administrative actions, the decision is subject to review by an Article III court within thirty days of the appointment. Accordingly, we reject First Federal's claims.
 
 VI
 
 62
 For the above reasons, the United States District Court for the Eastern District of Michigan's denial of a preliminary injunction is AFFIRMED. We do this without prejudice to any possible future claim that may be raised by First Federal.
 
 
 63
 CONTIE, Senior Circuit Judge.
 
 
 64
 For the following reasons, I concur in part and dissent in part. I concur in the majority's conclusion that the proper amount of loan loss reserves is not before us in this appeal. Although First Federal believes that the amount is not proper and is "unfair," it advances no legal theory in its brief for this proposition. I also agree with the majority that the broad injunction requested by appellant barring the appointment of a receiver in any instance is not ripe for judicial review. Under FIRREA, there are ten reasons articulated for the appointment of a receiver, 12 U.S.C. Secs. 1464(d)(2)(A) and (B), and we cannot know in advance what events will transpire.
 
 
 65
 However, I believe that one of the issues First Federal raises is ripe for judicial review.[1] In count III of its complaint, First Federal contends that OTS's enforcement of its regulations has abrogated First Federal's prior contract with the FHLBB concerning the treatment of supervisory goodwill[2] in violation of an express savings provision of FIRREA, Section 401(g), which states:
 
 
 66
 (g) SAVINGS PROVISIONS RELATING TO FHLBB.--
 
 
 67
 (1) EXISTING RIGHTS, DUTIES, AND OBLIGATIONS NOT AFFECTED.--
 
 
 68
 Subsection (a) shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which--
 
 
 69
 (A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law applicable with respect to such Board (other than title IV of the National Housing Act); and
 
 
 70
 (B) existed on the day before the date of the enactment of this Act.
 
 
 71
 I believe the district court had the authority to consider the merits of this issue under section 301, Sec. 1464(d)(1)(A) of FIRREA, which provides in pertinent part:The Director shall have power to enforce this section, section 8 of the Federal Deposit Insurance Act, and regulations prescribed hereunder.... Except as otherwise provided, the Director shall be subject to suit (other than suits on claims for money damages) by any Federal savings association or director or officer thereof with respect to any matter under this section or any other applicable law, or regulation thereunder, in the United States district court for the judicial district in which the savings association's home office is located....
 
 
 72
 (emphasis added).
 
 
 73
 I disagree with the majority's conclusion that Abbott Labs and its companion cases bar consideration of this issue on ripeness grounds. The Supreme Court in Abbott Labs considered whether a claim brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. Sec. 705, was ripe for judicial review. 387 U.S. at 140-41, 87 S.Ct. at 1510-12. In the present case, plaintiff is not suing under the APA but under a specific grant of jurisdiction given to federal savings associations pursuant to section 301, Sec. 1464(d)(1)(A) of FIRREA. There is no requirement in this grant of jurisdiction that the court consider purely legal issues. Indeed it would be difficult to see how a bank could challenge an action by OTS without reference to the facts of its own finances. Moreover, unlike many other statutory grants of jurisdiction which prescribe finality as a condition for reviewing administrative action, see, e.g., 42 U.S.C. Sec. 7607(b)(1), finality is not an explicit requirement under FIRREA. However, even if finality were required, I agree with the district court that OTS's denial of First Federal's capital plan constituted final agency action on this issue.[3] If OTS is able to avoid taking any final agency action sufficient for appeal of this issue short of placing a bank in receivership, the benefit of FIRREA's grant of jurisdiction to federal savings associations to challenge "any matter under this section" would be nullified. I believe it would be anomalous for Congress to confer a special grant of jurisdiction to federal savings associations which could be exercised only after a bank has been placed into receivership and is facing immediate liquidation.
 
 
 74
 For similar reasons, I don't believe that section 301, Sec. 1464(d)(2)(E) and (G) of FIRREA, which deal with suits for injunctive relief after a receiver has been appointed, apply to a claim for injunctive relief before a receiver has been appointed. I agree with the analysis in Century Federal Savings Bank v. United States, 745 F.Supp. 1363, 1367 (N.D.Ill.1990), in which the court stated:
 
 
 75
 Subsection 1464(d)(2)(G) prohibits the court from removing a receiver except as provided in Sec. 1464(d)(2)(E). Section 1464(d)(2)(E) permits an action filed within 30 days of an appointment, and requires the court to reach the merits before taking any action to remove a receiver. These subsections define the court's jurisdiction upon appointment of a receiver.
 
 
 76
 The jurisdictional grant in Sec. 1464(d)(1)(A) permits the court to entertain an action other than an action for money damages prior to appointment of a receiver. Section 1464(d)(2)(E) and (G) do not limit this jurisdictional grant, but they insure that a receiver [once appointed] may be removed only upon a decision on the merits. Congress may have determined that once a receiver was appointed, preliminary injunctive relief would have a deleterious effect upon a savings and loan association. After appointment, immediate, unobstructed action by the receiver may be essential to conserve the savings and loan association's assets and prevent panic. Prior to appointment, injunctive relief may prevent needless liquidation of viable savings and loan associations. Consistent with the plain language of these subsections, Sec. 1464(d)(1)(A) confers jurisdiction to enjoin actions by the OTS director pursuant to 1464.
 
 
 77
 (emphasis added). Section 1464(d)(1)(A) specifically grants federal savings associations jurisdiction to sue OTS concerning the regulations promulgated pursuant to FIRREA. I believe it would be inconsistent to interpret sections 1464(d)(2)(E) and (G) to mean that a bank must be placed into receivership before exercising this jurisdiction. For these reasons, I believe that in the present case the district court has authority to consider whether a preliminary injunction should be issued that would bar the appointment of a receiver on the ground that OTS's enforcement of its regulations concerning supervisory goodwill abrogates First Federal's prior contract with the FHLBB.
 
 
 78
 I believe that in the present case this issue is sufficiently ripe for judicial review because First Federal contends that OTS's enforcement of the challenged regulations forces an otherwise solvent bank into insolvency. Under GAAP, First Federal alleges that as of March 31, 1990, it had capital in the amount of 31.6 million dollars. However, the bank alleges it is anticipated that for fiscal 1990, because of the enforcement of the challenged regulations, it will show a loss primarily because it has been forced to recognize the write-off of the supervisory goodwill incurred during the Citizens acquisition. The ripeness doctrine as applied to administrative agencies states that agencies are protected from judicial interference until "an administrative decision has been formalized," and the effects of an administrative decision are felt in a concrete way. Abbott Labs, 387 U.S. at 148, 87 S.Ct. at 1515. I believe that in the present case the decision by OTS to enforce its regulations concerning the treatment of supervisory goodwill was formalized in the denial of First Federal's capital plan and that First Federal's expected conformity with the challenged regulations would cause the bank cognizable injury whether or not the bank is placed in receivership. As in Abbott Labs, Id. at 152-54, 87 S.Ct. at 1517-19, it is demanded by the government that First Federal comply with regulations that have an immediate adverse financial impact and failure to comply with the regulations exposes First Federal to the imposition of strong sanctions. In the present case, OTS's enforcement of its regulations concerning the treatment of supervisory goodwill is neither speculative nor hypothetical. Therefore, I believe a challenge to these regulations is ripe for judicial review. To conclude, I believe the district court was not barred from reviewing this issue by considerations of either jurisdiction or ripeness and the case should be remanded to the district court to determine whether a preliminary injunction should be granted.
 
 
 
 [1]
 First Federal Savings Bank and Trust is a federally-chartered savings and loan. First Federal Bancorp, Inc., a Delaware Corporation, is the parent corporation. Lakeland Financial Service Corporation is a wholly-owned subsidiary of First Federal. Citizens Federal Savings Bank is a Florida thrift that is also a wholly-owned subsidiary of First Federal. The acquisition of Citizens is central to this litigation
 
 
 [2]
 The district court denied the request for a preliminary injunction but granted First Federal's request for a Temporary Restraining Order. On August 10, 1990, by a 2-1 vote, a panel of this court granted First Federal's motion for a stay pending appeal. Thus, though we rule against First Federal, it has received some breathing space during the course of this litigation
 
 
 [3]
 The Agreement provided for one exception to this general rule: First Federal was not required to infuse capital to meet the regulatory capital requirement for the quarter immediately preceding the acquisition
 
 
 [4]
 Supervisory goodwill is an accounting construct that has recently come under fire. At the time of acquisition, the books of an insolvent thrift are balanced. An insolvent thrift will, by definition, have fewer assets than liabilities. The difference between assets and liabilities is calculated and carried on the books of the new entity as an "asset"--supervisory goodwill. Under this accounting system, a greater net liability simply means that the thrift has more supervisory goodwill. Thus, the deeper an insolvent savings and loan is in the hole, the greater the amount of supervisory goodwill that an acquiring thrift will be allowed to carry on the books as an asset. Over a period of years, the new thrift writes off the supervisory goodwill, eventually reducing the amount of this "asset" to zero
 
 
 [5]
 Of course, GAAP has nothing to say about meeting regulatory requirements, as distinct from calculating one's balance sheet
 
 
 [6]
 This limitation may increase the amount of the "asset" that must be removed from the books each year, and thus creates the need for additional capital infusions
 
 
 [7]
 We were informed at oral argument that a second capital plan submitted by First Federal has, like the first, been rejected by the OTS
 
 
 [8]
 We conclude that the interpretation advanced by First Federal would be counterproductive, even from the point of view of savings and loans generally, because it would give the OTS an incentive to ambush banks by surprise rather than giving them some type of opportunity to defend themselves. In effect, we would punish the OTS for letting troubled savings and loans know that the OTS suspected trouble
 
 
 [1]
 In the companion case, Franklin Federal Savings Bank v. Director, Office of Thrift Supervision, 927 F.2d 1332 the district court reviewed the same issue in a request for declaratory judgment. However, the majority did not dispose of Franklin Federal's claim on ripeness or jurisdictional grounds. I believe this is inconsistent
 
 
 [2]
 Specifically, First Federal alleges that it was invited and urged by FSLIC and FHLBB to acquire the insolvent thrift, Capital Federal Savings and Loan Association. First Federal alleges that it was promised specific capital forbearances and accounting treatment, allowing the supervisory goodwill created by the Citizen's acquisition to be included in its capital requirements
 
 
 [3]
 Under the regulations concerning the treatment of supervisory goodwill promulgated pursuant to FIRREA, OTS no longer allows supervisory goodwill to be included in the calculation of regulatory capital. In addition, the regulations require consolidated reporting for a parent corporation and all subsidiaries. A supervisory directive from OTS, consistent with its new capital regulations on the treatment of supervisory goodwill, required that First Federal submit a capital plan for approval by January 8, 1990. On January 8, 1990, First Federal submitted a capital plan, requesting an exemption from these regulations because of its prior agreement with the FHLBB concerning the treatment of the supervisory goodwill created by the acquisition of Citizens. OTS refused to grant the exemption and denied First Federal's capital plan